ALEXANDER SHOKAI, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Alexander Shokai, Inc. v. Commissioner
Docket Nos. 16443-89, 16543-89, 18181-89
United States Tax Court
T.C. Memo 1992-41; 1992 Tax Ct. Memo LEXIS 47; 63 T.C.M. (CCH) 1870; T.C.M. (RIA) 92041; January 21, 1992, Filed *47 Decision will be entered for respondent in docket No. 16543-89. Decisions will be entered under Rule 155 in docket Nos. 16443-89 and 18181-89. Ronald K. Van Wert, for petitioners. Louis B. Jack, Thomas Travers, and Jerry Gartside, for respondent. WRIGHT,Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Docket No. 16443-89 -- ALEXANDER SHOKAI, INC.
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)(1)
6653(b)/6653(b)(1)
6653(b)(2)
6661
2/28/81
$ 129,034
$ 71,913
2/28/82
101,426
67,627
2/28/83
133,215
$ 33,108
[1] 78,428
[2]
$ 33,304
2/28/84
135,900
36,001
[1] 122,393
[2]
33,975
*48 Docket No. 16543-89 -- EDWARD ALEXANDER
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)/6653(b)(1)
6653(b)(2)
6661
1980
$ 133,564
$ 66,782
1981
159,630
79,815
1982
127,993
[1] 63,996
[2]
$ 31,998
1983
132,081
[1] 66,040
[2]
33,020
Docket No. 18181-89 -- ESTELLE ALEXANDER
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1982
$ 127,993
$ 6,400
[1]
$ 31,998
1983
$ 132,081
6,604
[1]
33,020
*49 The issues for decision are as follows: (1) For the taxable years ended February 28, 1981, through February 28, 1983, whether E. Alexander, Inc., properly deducted as "Officer's Salary" the amounts it paid to Mrs. Alexander. We hold that the corporation improperly deducted these amounts. (2) Whether the amounts E. Alexander, Inc., paid to Mrs. Alexander were properly reported in the Alexanders' income as salary income in the taxable years 1981 through 1983. We hold that the Alexanders should have reported this income as dividend income rather than salary income as determined by respondent. (3) For the taxable years ended February 28, 1981, through February 28, 1984, whether E. Alexander, Inc., properly deducted its expenses attributable to the corporate-owned Mercedes Benz used by Mrs. Alexander. We hold that the corporation improperly deducted these expenses. (4) *50 Whether E. Alexander, Inc., properly claimed an investment tax credit in the taxable year ended February 28, 1981, on its purchase of the corporate-owned Mercedes used by Mrs. Alexander. We hold that the corporation improperly claimed this investment tax credit. (5) Whether the Alexanders should have included the value of Mrs. Alexander's use of this corporate-owned Mercedes in their income in the taxable years 1980 through 1983. We hold that the Alexanders should have included the value of Mrs. Alexander's use of this automobile in their income as dividend income. (6) Whether E. Alexander, Inc., and/or the Alexanders received unreported income from Gosen Co., Ltd., in the taxable years in issue. We hold that both E. Alexander, Inc., and the Alexanders received unreported income from Gosen Co., Ltd. (7) Whether E. Alexander, Inc., and the Alexanders should have reported this income upon receipt by Mr. Alexander. We hold that they should have reported this income upon receipt by Mr. Alexander. (8) Whether Mr. Alexander fraudulently intended to evade paying taxes known to be owing in the taxable years 1980 through 1983. We hold that Mr. Alexander fraudulently intended to evade *51 paying taxes known to be owing in these taxable years. (9) Whether Mr. Alexander can use the defense of reasonable reliance on an accountant to rebut respondent's proof of fraud in the taxable years 1980 through 1983. We hold that Mr. Alexander cannot use this defense for these taxable years. (10) Whether E. Alexander, Inc., fraudulently intended to evade paying taxes known to be owing in the taxable years ended February 28, 1981, 1982, and 1983. We hold that the corporation fraudulently intended to evade paying taxes known to be owing in these taxable years. (11) Whether E. Alexander, Inc., can use the defense of reasonable reliance on an accountant to rebut respondent's proof of fraud for the taxable years ended February 28, 1981, 1982, and 1983. We hold that the corporation cannot use this defense for these taxable years. (12) Whether E. Alexander, Inc., fraudulently intended to evade paying taxes known to be owing in the taxable year ended February 28, 1984, in light of its reliance on the advice of its tax advisers pertaining to the income in question. We hold that the corporation reasonably relied on the advice of its tax advisers and, thus, did not file a fraudulent *52 return for the taxable year ended February 28, 1984. (13) Whether the statute of limitations bars the assessment and collection of the deficiencies and additions to tax set forth in respondent's notices of deficiency to E. Alexander, Inc., Mr. Alexander, and Mrs. Alexander. We hold the statutes of limitations are open in accordance with this opinion. (14) Whether E. Alexander, Inc., is liable for the additions to tax pursuant to sections 6651(a)(1) [2] and 6661 determined against it for the taxable years ended February 28, 1983, and February 28, 1984. We hold that the corporation is liable for such additions to tax in accordance with this opinion. (15) Whether Mr. Alexander is liable for the additions to tax pursuant to section 6661 determined against him for the taxable years 1982 and 1983. *53 We hold that Mr. Alexander is liable for such additions to tax in accordance with this opinion. (16) Whether Mrs. Alexander is liable for the additions to tax determined against her for the taxable years 1982 and 1983. We hold that Mrs. Alexander is liable for additions to tax in accordance with this opinion. (17) Whether Alexander Shokai, Inc., is primarily liable for the deficiencies and additions to tax of E. Alexander, Inc., or whether Alexander Shokai, Inc., is liable only as a "transferee" within the meaning of section 6901. We hold that Alexander Shokai, Inc., is primarily liable for E. Alexander, Inc.'s deficiencies and additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated in this opinion. Mr. and Mrs. Alexander resided in Laguna Beach, California, when they filed their petitions. Alexander Shokai, Inc., had its principal place of business in Irvine, California, when it filed its petition. Mr. and Mrs. Alexander's Tax Returns
Mr. and Mrs. Alexander filed joint individual income tax returns for the calendar years 1980 through 1983. On these tax returns, the Alexanders *54 reported the following amounts as gross income: $ 344,601 in 1980, $ 219,546 in 1981, $ 251,603 in 1982, and $ 284,810 in 1983. For each of these years, their tax returns were based upon the cash basis method of accounting. Mr. Alexander's Tax Knowledge
Mr. Alexander never graduated from high school. (Hereinafter, all references to petitioner in the singular will refer to Mr. Alexander.) Petitioner never received any formal training in accounting, bookkeeping, or the preparation of tax returns. He claimed he never prepared any corporate or individual tax returns, but instead submitted all the necessary information to his personal/corporate accountant who then prepared the tax returns. Petitioner claims he did not review the returns prepared by the accountant. Petitioner claims that he never participated in classifying any deductions on his personal or corporate tax returns and that he was ignorant "as far as tax business." Sometime in the seventies or early eighties, petitioner and his accountant discussed forming a domestic international sales corporation to defer paying tax on the export of U.S.-made merchandise. At some point, they also discussed the tax advantages *55 of purchasing municipal bonds. In 1984, he had a meeting with his attorney in which they discussed the potential of forming a foreign corporation to avoid paying U.S. taxes on foreign-earned income. At this meeting, they specifically discussed using a controlled foreign corporation, the attribution rules of subchapter F, and the availability of low tax rates in lesser-developed countries. E. Alexander, Inc.
For each of the years in issue, petitioner was the president and sole stockholder of record of E. Alexander, Inc. (EAI), and Mrs. Alexander was the corporate secretary. EAI was a California corporation. During the years in issue, EAI was in the business of importing tennis racket strings for resale to companies in the United States. For each of the years in issue, EAI recorded its income and expenses on the cash basis method of accounting and accounted for and reported Federal income tax on the basis of a fiscal year ending February 28. (For simplicity, the fiscal years of the corporation for the years ended February 28, 1981, 1982, 1983, and 1984 will hereinafter be referred to as the taxable years 1980, 1981, 1982, and 1983, respectively.) EAI timely filed its corporate *56 income tax returns for the taxable years 1980 through 1983. After a reduction for income taxes, the corporation had net earnings of $ 58,944, $ 81,735, $ 70,038, and $ 131,858 for the taxable years 1980 through 1983, respectively. The corporation paid no dividends in any of these years. The corporation had one banking account into which all its gross receipts were deposited. Salary Expense
When petitioner began his importing business, he operated it out of his home with the assistance of Mrs. Alexander. Mrs. Alexander lent the corporation money, answered telephones, typed letters and invoices, talked to customs brokers, signed checks and the corporate minutes, and advised petitioner on the quality of imported tennis apparel. Petitioner moved the business out of his home in the late seventies. At this time, he hired Mr. Ritzman to replace Mrs. Alexander. Mr. Ritzman was subsequently replaced in March 1983 by Mr. Ziegler. Mr. Ritzman and Mr. Ziegler were both office managers of EAI. As such, their duties consisted of depositing all corporate receipts into the corporate bank account, answering the phone, opening mail, invoicing customers, paying corporate expenses, signing *57 corporate checks, and forwarding all income and expense information to the corporate accountant for entry into the corporate books. Petitioners never clearly enunciated the duties, if any, that Mrs. Alexander performed for the corporation after Mr. Ritzman's arrival. It is clear that she no longer came into the office and was no longer actively involved in the business. Mrs. Alexander's business activity was minimal and consisted of occasionally forwarding messages to petitioner when he traveled overseas three or four times a year. In 1980, 1981, and 1982, EAI paid Mrs. Alexander $ 36,000 annually and classified such payments as "Officer's Salary". EAI's accountant determined the amount of her compensation, and petitioner concurred in this determination. The accountant, Mr. E. Bartelt, claims that some of these payments to Mrs. Alexander represented compensation for past services rendered by her. The corporation deducted the $ 36,000 annual payments under the category of "Officer's Salaries" on its Federal corporate income tax returns for taxable years 1980, 1981 and 1982. On their individual tax returns for 1980 through 1982, the Alexanders reported $ 46,000, $ 26,000, and *58 $ 62,000, respectively, as salary income earned by Mrs. Alexander from EAI. Corporate-Owned Automobile
On May 23, 1980, EAI purchased a Mercedes Benz for $ 35,389. Mrs. Alexander used this Mercedes in 1980, 1981, 1982, and 1983. The parties stipulated that petitioner used the car on occasion during these years. For these years, EAI deducted depreciation on the Mercedes and paid and deducted the Mercedes' insurance and license fees. In the taxable year 1980, EAI claimed an investment tax credit of $ 3,539 with respect to its 1980 purchase of the Mercedes. The Alexanders did not include the value of Mrs. Alexander's use of this automobile as income on their joint tax returns for 1980 through 1983. Merger of E. Alexander, Inc., and Alexander Shokai, Inc.
Alexander Shokai, Inc. (Shokai), a California corporation, was incorporated in 1982. Throughout the taxable years in issue, petitioner was its president and sole shareholder. On January 26, 1984, EAI and Shokai entered an "Agreement of Merger (And Plan of Reorganization)". Pursuant to this merger agreement, EAI became the "disappearing corporation", and Shokai became the "survivor corporation". As the survivor corporation, *59 Shokai became subject to all of EAI's debts and liabilities "as if it had itself incurred them". The tax liabilities in issue arose in the taxable years of EAI. The merger of EAI and Shokai was consummated under the provisions of chapter 11 of the California Corporations Code. Section 1107 of chapter 11 provides that a surviving corporation in a merger pursuant to chapter 11 is subject to all the debts and liabilities of the disappearing corporation in the same manner as if the surviving corporation had itself incurred them. Cal. Corp. Code sec. 1107 (West 1990). Gosen Agreements and Gosen Payments
Gosen Co., Ltd. (Gosen), of Osaka, Japan, manufactures tennis racket string. During each of its taxable years 1980 through 1983, EAI purchased Gosen's string for resale in the United States. On March 30, 1979, Gosen executed a written agreement entitled "General Sales Agreement Between E. Alexander, Inc., U.S.A. and Gosen Co., Ltd., Osaka Japan". Pursuant to this agreement, EAI became Gosen's exclusive U.S. sales agent. EAI also became entitled to receive a 10-percent sales commission on all string it purchased from Gosen. Petitioner signed this document as president of EAI. *60 On December 30, 1980, the March 30, 1979, agreement was amended by another written agreement entitled "Sole Agency Agreement". This agreement was entered into between Gosen and EAI. Again, petitioner signed this agreement as president of EAI. Pursuant to this agreement, the 10-percent sales commission was segregated as a 5-percent sales commission and a 5-percent advertising expense reimbursement fee. The National Japanese Taxing Authority (NTA) suggested that the 10-percent commission payments be segregated in this manner. EAI never did any advertising for Gosen; instead, the amounts were merely classified as advertising. We find the 5 percent received as advertising expense reimbursement fees was in substance a 5-percent commission payment. On May 2, 1979, Gosen executed another written agreement entitled "The Return of Excess Proceeds in Japanese Yen by the Foreign Exchange Rate of Yen to U.S. Dollars". This agreement was addressed to "E. Alexander, Inc.", from Gosen and was signed by petitioner. The purpose of this agreement was to protect both corporations from fluctuations in the yen on EAI's purchases of Gosen string. Apparently Gosen billed EAI in yen, and EAI paid *61 in dollars. If the exchange rate of yen to dollars increased from the time Gosen billed EAI to the time EAI paid Gosen, EAI would have overpaid Gosen. This final agreement provided that if the exchange rate for yen exceeded a certain amount against the dollar, Gosen would repay the additional amounts to EAI. This agreement also protected Gosen if the exchange rate of yen to dollars decreased. Hereinafter, the above referenced agreements will be referred to collectively as the Gosen agreements, and the payments for sales commissions (which include the advertising reimbursement fees) and currency fluctuations will be referred to collectively as the Gosen payments. Mr. Kiyoshi Matsuo was involved in the execution of each of the Gosen agreements and was the head of the export-import department of Gosen at these times. Mr. Matsuo testified that all the Gosen agreements were between Gosen and EAI. He further testified that the commission payments were based on the amount of string EAI purchased from Gosen. Petitioner also testified that the Gosen agreements were between Gosen and EAI and that the commission payments were based on sales made to EAI. During the years in issue, none *62 of the Gosen payments were recorded on EAI's corporate books as its income, and none were deposited into EAI's corporate bank account. Instead, all but two of the payments were deposited into an individual checking account opened by petitioner in 1974 at the Bank of America in Osaka, Japan (Osaka account). The first two Gosen payments were made by remittances to petitioner from Gosen. Thereafter, at the request of the NTA that Gosen make the payments by bank transfers, Gosen electronically wired the payments from its bank account to petitioner's Osaka account. Petitioner directed the payments to be sent to his Osaka account. Bank records indicate Gosen paid petitioner $ 944,269.22 between March 4, 1980, and November 28, 1983, as follows: Date of Payment
Amount of Payment
March 4, 1980
[1] $ 44,079.46
March 4, 1980
[1] 20,000.00
June 18, 1980
60,557.22
November 12, 1980
35,000.00
November 12, 1980
25,000.00
January 14, 1981
47,346.14
April 21, 1981
55,000.00
August 18, 1981
15,000.00
August 18, 1981
45,000.00
December 3, 1981
60,000.00
March 12, 1982
60,954.86
April 21, 1982
50,000.00
August 19, 1982
56,331.54
November 30, 1983
40,000.00
November 30, 1983
40,000.00
May 6, 1983
50,000.00
May 6, 1983
50,000.00
August 8, 1983
50,000.00
August 8, 1983
50,000.00
November 28, 1983
40,000.00
November 28, 1983
50,000.00
$ 944,269.22
*63 There is no evidence that any amounts other than the proceeds from the Gosen payments were deposited into the Osaka account. Once the amounts were deposited into the Osaka account, petitioner withdrew them for various reasons. Petitioner withdrew a large amount from the Osaka account to transfer to his personal accounts maintained in the United States. To effect these transfers, petitioner withdrew money in small increments and then mailed them to the United States. Petitioner utilized this method of transferring funds to avoid violating customs laws. Petitioner also withdrew funds to pay for his traveling expenses while in Japan. Petitioner testified at trial that he took no deductions for expenses incurred while traveling in Japan. Lastly, petitioner transferred a large amount, $ 100,000, to a Singapore account set up by him in 1984. From 1980 through 1983, petitioner withdrew *64 $ 565,551 from the Osaka account in the following yearly amounts: $ 66,370 in 1980, $ 215,287 in 1981, $ 140,571 in 1982, and $ 143,323 in 1983. At petitioner's request, the Bank of America in Osaka held all bank statements for the Osaka account at the Osaka Bank. Petitioner never received any of these bank statements. During the years in issue, neither Mrs. Alexander, EAI's office manager, nor petitioner's accountant was aware of this account. In each of the years in issue, Gosen prepared statements approximately once every 3 months for EAI outlining the amount and source of each of the Gosen payments. Gosen never mailed these statements to the corporation but rather held them for petitioner to review and sign when he visited Japan. Petitioner kept no records of the Gosen payments. During or prior to the years in issue, petitioner never informed his corporate staff about the Gosen payments. Neither the Alexanders nor EAI reported the Gosen payments as income on their tax returns in the years at issue. Petitioner testified at trial that he did not report the income in the years in issue because he purportedly was advised by Mr. K. Bartelt, Mr. E. Bartelt's father, that the *65 income was not taxable until brought into the United States. On brief, petitioner contends he did not report the income in the years in issue because there was a certain restriction on the funds. This alleged "restriction" involved an NTA audit of Gosen conducted to determine whether Gosen properly deducted the Gosen payments. At the time the parties entered the Gosen agreements, Gosen was unsure whether the NTA would approve its deductions for these payments; therefore, petitioner and Gosen orally agreed that if the NTA determined that Gosen improperly deducted the Gosen payments, the payments would be returned to Gosen. No one but petitioner and Gosen knew of this oral agreement until after the IRS began its audit in July 1984. Petitioner never received any written documentation from the NTA regarding the nature of its audit. Petitioner also never received any written documentation from the NTA informing him he could not withdraw funds from the Osaka account. Petitioner testified that the only restriction on the Gosen payments was his contingent obligation to return the payments. After February 28, 1984, petitioner learned the NTA had completed its audit of Gosen and had *66 allowed Gosen's deductions for the payments. In May 1984, the NTA notified the IRS of the potential existence of petitioner's Osaka account, the Gosen agreements, and the Gosen payments. On July 23, 1984, the IRS contacted petitioner for the first time. At this point, petitioner told his accountant, Mr. E. Bartelt, another accountant, and his corporate attorney about the Osaka account, the Gosen agreements, the Gosen payments, and his contingent oral agreement to return the payments. Sometime in late 1984, these three tax advisers determined the Gosen payments had not accrued as income until the NTA had finished its audit in 1984 and, thus, petitioners should not include the Gosen payments in their income until their 1984 taxable year. In October 1984, petitioners' attorney suggested that a statement be attached to the corporation's tax return for the taxable year 1983 outlining the scope of the NTA audit. Following this advice, EAI attached the following statement to its return for taxable year 1983: Taxpayer has been advised that the Japanese Tax Authorities have recently completed an examination of taxpayer's Japanese supplier. Taxpayer understands that the Japanese Tax *67 Authorities have authorized the propriety of payments to the taxpayer of amounts originally held in an account maintained in Japan. Report of the examination was not provided taxpayer until after its fiscal year ended February 1984 and the supplier notified it of the release of any claim for the earlier fiscal year involved. Accordingly, these amounts will be included in taxpayer's income for the later year subject to conclusion of the pending Internal Revenue Service investigation into prior fiscal year of taxpayer. While it is expected that these amounts will total $ 870,000.00, a cursory review of the records require a deposit search to determine whether any payment was previously recognized by the taxpayer.
Following the tax advisers' advice, Shokai, as successor of EAI, reported the income on its subchapter S corporate income tax return for the taxable year 1984. The Alexanders reported the income on their 1984 joint individual income tax return. There is no indication that petitioner was advised prior to or during the years in issue that the income was not taxable until the NTA had completed its audit. Reliance on Mr. K. Bartelt
Mr. K. Bartelt was an accountant *68 and petitioner's friend. Mr. K. Bartelt retired as an accountant in 1968 and left his business to his son, Mr. E. Bartelt. Prior to his retirement, Mr. K. Bartelt advised petitioner on tax matters; after his retirement, he continued to advise petitioner on an informal basis. In the late seventies, petitioner asked Mr. K. Bartelt about the U.S. tax treatment of the Gosen payments. He was advised that the Gosen payments were not taxable until they were actually brought into the United States. Subsequently, petitioner brought a portion of the Gosen payments into the United States; he did not report them in taxable income at this time. During the years in issue, Mr. K. Bartelt was aware of the Osaka account, but was not aware of petitioner's contingent oral agreement to return the Gosen payments. Reliance on Mr. E. Bartelt
Mr. E. Bartelt, a certified public accountant, served as an officer of EAI for the taxable years 1980 through 1983. However, Mr. E. Bartelt performed no official corporate duties. For the years in issue, Mr. E. Bartelt prepared EAI's and Shokai's corporate income tax returns. He also prepared the Alexanders' Federal individual income tax returns and personal *69 financial statements for the years in issue. Prior to the 1984 IRS audit, Mr. E. Bartelt was not aware of the existence of the Gosen agreements, the Gosen payments, the Osaka account, or petitioner's contingent oral agreement to return the Gosen payments. Petitioner never requested Mr. E. Bartelt's advice prior to 1984 about the tax treatment of the Gosen payments. Petitioner informed Mr. E. Bartelt of the Gosen payments, etc., after petitioner was contacted in July 1984 by a special agent from the IRS. Notices of Deficiency
In his notice of deficiency to Shokai, as successor of EAI, respondent made the following determinations: (1) The corporation received unreported income from Gosen in the amounts of $ 231,983, $ 175,000, $ 247,286, and $ 290,000 in the taxable years 1980 through 1983, respectively; (2) the $ 36,000 the corporation paid to Mrs. Alexander annually in the taxable years 1980 through 1982 was improperly deducted as a salary expense because such amounts were unreasonable, excessive, or paid for personal services not actually rendered; (3) the amounts the corporation expended on automobile insurance for the corporate-owned Mercedes used by Mrs. Alexander in *70 the amounts of $ 949, $ 1,122, $ 1,098, and $ 1,380 for the taxable years 1980 through 1983, respectively, were improperly deducted because Mrs. Alexander provided no discernible services to the corporation; (4) the depreciation on the corporate-owned Mercedes used by Mrs. Alexander in the amounts of $ 7,583, $ 7,945, $ 5,675, and $ 4,053 for the taxable years 1980 through 1983, respectively, was improperly deducted because the car was not used in a trade or business or for the production of income; (4) the amounts the corporation expended on vehicle license fees for the corporate-owned Mercedes used by Mrs. Alexander in the amounts of $ 427 in 1981 and $ 350 in 1982 were improperly deducted because Mrs. Alexander provided no discernible services to the corporation; (5) the $ 3,539 claimed as an investment tax credit in 1980 on the purchase of the Mercedes used by Mrs. Alexander was improper because the corporation did not establish the Mercedes was acquired and placed into service as qualifying property used in a trade or business; and (6) the corporation was liable for the additions to tax as enunciated in the opening statement of this opinion. Respondent issued separate notices *71 of deficiency to petitioner and Mrs. Alexander. The notices of deficiency were issued separately to exclude Mrs. Alexander from any implication of fraud. In the notice of deficiency to petitioner, respondent made the following determinations: (1) Petitioner received unreported income from Gosen in the amounts of $ 184,637, $ 222,346, $ 247,286, and $ 242,776 in the taxable years 1980 through 1983, respectively; (2) petitioner failed to report a long-term capital gain of $ 15,359 (after an applicable section 1202 capital gains deduction) from a return of capital from EAI in the taxable year 1983; (3) petitioner improperly characterized the dividend income received from EAI as salary income in the amounts of $ 20,000, $ 26,000, and $ 62,000 in the taxable years 1980 through 1982, respectively; (3) petitioner failed to report the value of Mrs. Alexander's use of the corporate-owned Mercedes as income in the amounts of $ 4,200, $ 7,200, $ 7,200, and $ 6,028 in the taxable years 1980 through 1983, respectively; and (5) petitioner was liable for the additions to tax as enunciated in the opening statement of this opinion. In his separate notice of deficiency issued to Mrs. Alexander, *72 respondent made the following determinations: (1) Mrs. Alexander received unreported income from Gosen in the amounts of $ 247,286 and $ 242,776 in the taxable years 1982 and 1983, respectively; (2) Mrs. Alexander failed to report a long-term capital gain of $ 15,359 (after an applicable section 1202 capital gains deduction) from a return of capital from EAI in the taxable year 1983; (3) Mrs. Alexander improperly characterized the dividend income received from EAI in 1982 as salary income in the amount of $ 62,000; (4) Mrs. Alexander failed to report the value of her use of the corporate-owned Mercedes as income in the amounts of $ 7,200 and $ 6,028 in the taxable years 1982 and 1983, respectively; and (5) Mrs. Alexander was liable for the additions to tax as enunciated in the opening statement of this opinion. OPINION I. SALARY PAYMENT TO MRS. ALEXANDER A. Propriety of the Deduction by the Corporation
During all the years in issue, Mrs. Alexander held the official position at EAI of corporate secretary. In each of its taxable years 1980, 1981, and 1982, EAI paid Mrs. Alexander $ 36,000 and deducted this amount as "Officer's Salary". In his notice of deficiency to the corporation, *73 respondent determined EAI improperly deducted these amounts because they were unreasonable, excessive, or paid for personal services not actually rendered. Section 162(a) allows as a deduction a reasonable allowance for salaries or other compensation for personal services rendered when such allowances are ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Any amount paid in the form of compensation, but not in fact paid as the purchase price of services, is not deductible. Sec. 1.162-7(b)(1), Income Tax Regs.
In the instant case, when petitioner began his importing business, he operated it out of his home with the assistance of his wife. Mrs. Alexander's duties consisted of lending the corporation money, answering telephones, typing letters and invoices, talking to customs brokers, signing checks and the corporate minutes, and advising petitioner on the quality of imported tennis apparel. Petitioner moved the business out of his home in the late seventies. At this time, he hired Mr. Ritzman to replace Mrs. Alexander. Mr. Ritzman was subsequently replaced in March 1983 by Mr. Ziegler. After Mr. Ritzman replaced Mrs. *74 Alexander, petitioners never enunciated clearly what, if any, services she continued to render to the corporation. When petitioner traveled overseas three or four times a year, Mrs. Alexander may have taken and forwarded messages to him. However, petitioners failed to establish this fact clearly. It is clear she never came into the office and was no longer actively involved in the affairs of the corporation. While she still held the official position of corporate secretary, the record does not indicate she performed any official duties. Petitioners have the burden of proving that the amounts it expended represented the purchase price of services performed by Mrs. Alexander during these taxable years. Rule 142(a). Petitioners have not met this burden of proof. Mr. E. Bartelt, the accountant who determined the amount of Mrs. Alexander's compensation, claimed some of these annual payments represented compensation for past services rendered by Mrs. Alexander. However, petitioners presented no evidence proving such an assertion. Thus, they again failed to satisfy their burden of proof. Therefore, we hold that the $ 36,000 EAI paid Mrs. Alexander in taxable years 1980 through *75 1982 was not a reasonable allowance for salary or other compensation for personal services Mrs. Alexander rendered during or prior to these taxable years. Accordingly, we sustain respondent's determination disallowing EAI's $ 36,000 annual salary deduction in the taxable years 1980, 1981, and 1982. B. Tax Treatment of the Payment to Mrs. Alexander
On their joint tax returns for 1980, 1981, and 1982, the Alexanders reported $ 46,000, $ 26,000, and $ 62,000, respectively, as salary income earned by Mrs. Alexander from EAI. Respondent recharacterized $ 20,000, $ 26,000, and $ 62,000 of these amounts as dividend income for the taxable years 1980, 1981, and 1982, respectively. Because Mrs. Alexander owned no stock in EAI, respondent determined the payments were properly characterized as constructive dividends to petitioner, EAI's sole stockholder. A payee's tax treatment of amounts ostensibly paid to him as compensation, but not allowed to be deducted as such by the payor, will depend upon the circumstances of each case. Sec. 1.162-8, Income Tax Regs. If such payments do not represent amounts paid as compensation for services rendered, they must be treated as what they actually *76 are. Sterno Sales Corp. v. United States, 170 Ct. Cl. 506, 345 F.2d 552, 556 (1965). Petitioners argue that the payments to Mrs. Alexander were made to compensate her for services rendered. However, as discussed supra, petitioners have failed to prove Mrs. Alexander actually rendered any services to the corporation during or prior to the years in issue that would justify characterizing the payments as such. In our view, respondent correctly determined that the alleged "salary" payments made by EAI to Mrs. Alexander were in substance constructive dividends paid to petitioner. Despite an intrafamily gratuitous assignment of income, income remains taxable to a taxpayer when he earns it or derives it from property he owns. Helvering v. Eubank, 311 U.S. 122 (1940); Helvering v. Horst, 311 U.S. 112 (1940); Lucas v. Earl, 281 U.S. 111 (1930). In the instant case, the only inference to be drawn from the evidence is that the alleged "salary" payments were made by EAI because of petitioner's controlling stock ownership and, therefore, were in substance a return on the stock owned by petitioner. *77 When EAI made the payments to Mrs. Alexander, petitioner owned all the stock in EAI. Because of Mrs. Alexander's relationship to petitioner, the payments bore a close relationship to the corporation's entire stockholdings. The payments also were in the nature of a distribution of corporate earnings because during the years in issue EAI distributed none of its earnings as dividends, yet Mrs. Alexander annually received a portion of them as salary payments. Further, petitioners presented no proof disputing respondent's determination. We find that the payments were in substance a return on the stock owned by petitioner and are properly characterized as constructive dividends to petitioner in the amounts determined by respondent. See Broad v. Commissioner, T.C. Memo. 1990-317 (alleged "salary" payments to children of controlling stockholders found to be constructive dividends to stockholders where taxpayers failed to prove children rendered any services to the corporation); Jolly's Motor Livery Co. v. Commissioner, T.C. Memo. 1957-231 (alleged "salary" payments to wife of controlling stockholder found to be constructive dividends to stockholder *78 where wife performed no services for corporation). II. MRS. ALEXANDER'S AUTOMOBILE EXPENSES During each of its taxable years 1980 through 1983, EAI provided Mrs. Alexander with a corporate-owned Mercedes Benz. The corporation purchased the Mercedes in 1980 for $ 35,389 and claimed an investment tax credit of $ 3,539 in this taxable year. In 1980 through 1983, the corporation paid for the automobile insurance and license fees on this vehicle and claimed deductions for depreciation, automobile insurance, and license fees. The Alexanders did not report the value of Mrs. Alexander's use of the automobile as income on any of their joint tax returns. Respondent determined that the corporation improperly deducted the expenses it incurred pertaining to the Mercedes because Mrs. Alexander provided no discernible services to the corporation. Respondent also determined EAI improperly claimed the investment tax credit because the corporation failed to establish the Mercedes was acquired and placed into service as qualified property used in a trade or business. Respondent also determined that the Alexanders failed to report the value of Mrs. Alexander's personal use of the Mercedes as *79 income in the taxable years 1980 through 1983 in the amounts of $ 4,200, $ 7,200, $ 7,200, and $ 6,028, respectively. Regarding the propriety of the deductions taken by the corporation, it is well established that when corporate property is used by a shareholder or member of his family for personal purposes, not proximately related to the corporate business, the corporation is not entitled to deductions to the extent that the corporate property was used for personal reasons. Falsetti v. Commissioner, 85 T.C. 332, 356 (1985). Petitioners presented no evidence indicating Mrs. Alexander used the automobile for any corporate business purpose. The parties stipulated that petitioner occasionally used the car, but petitioners presented no evidence indicating his use was for business purposes. Petitioners presented no other evidence indicating the Mercedes was used for business purposes during the taxable years 1980 through 1983. We conclude, therefore, that the corporation improperly deducted expenses for depreciation, license fees, and insurance, and improperly claimed an investment tax credit pertaining to the Mercedes in the amounts determined by respondent. *80 Regarding the Alexanders' tax treatment of Mrs. Alexander's use of the automobile, it is also well established that when corporate property is used by a shareholder or member of his family for personal purposes, not proximately related to the corporate business, the value of such property is includable in the shareholder's income as a constructive dividend. Falsetti v. Commissioner, supra at 356. According to the Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie, for the value of the personal use of corporate property to be treated as a constructive dividend for tax purposes, the expenses (1) must be nondeductible to the corporation, and (2) must represent some economic gain or benefit to the shareholder. Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977), affg. in part, revg. in part, and remanding T.C. Memo. 1973-223. In the instant case, these expenses were nondeductible to the corporation. Furthermore, Mrs. Alexander economically benefited from her use of the corporate-owned Mercedes because she personally used the Mercedes without paying any *81 part of its purchase price and without incurring any expenses for insurance or license fees. Petitioners have presented no evidence disputing respondent's determination of the value of Mrs. Alexander's personal use of the Mercedes. We conclude that the value of Mrs. Alexander's personal use of the Mercedes is to be taxed as constructive dividend income to petitioner in the amounts determined by respondent. III. TAX TREATMENT OF INCOME FROM THE GOSEN PAYMENTS A. Whose Income the Gosen Payments Are
Between March 4, 1980, and November 28, 1983, Gosen paid petitioner $ 944,269.22 pursuant to the Gosen agreements. This sum represented payments received for commissions and currency fluctuations. Respondent alleges that these proceeds were gross receipts of EAI diverted by petitioner. When controlling shareholders divert corporate receipts to themselves, the diverted receipts are fully taxable to the corporation to which they are attributable. Truesdell v. Commissioner, 89 T.C. 1280, 1300 (1987). Further, these funds are properly treated as constructive dividends to the controlling shareholders for tax purposes. United States v. Miller, 545 F.2d 1204, 1211 (9th Cir. 1976); *82 DiLeo v. Commissioner, 96 T.C. 858, 883 (1991). Accordingly in the instant case, respondent determined that the proper tax treatment of the diverted funds was that EAI received unreported income in the taxable years 1980 through 1983 in the amounts of $ 231,983, $ 175,000, $ 247,286, and $ 290,000, respectively. Respondent also determined the diverted corporate funds were to be included in the Alexanders' taxable income. To the extent EAI had sufficient earnings and profits, respondent included the diverted funds in gross income as dividends. Secs. 316(a), 301(c)(1). To the extent the amount of the diverted funds exceeded both EAI's earnings and profits and petitioner's adjusted basis in the stock, respondent treated the funds as a gain from the sale or exchange of property. Sec. 301(c)(2) and (3). Respondent determined the Alexanders had dividend income of $ 184,637, $ 222,346, $ 247,286, and $ 242,776 in the taxable years 1980 through 1983, respectively, and a gain from the sale or exchange of property of $ 15,359 (after an applicable section 1202 capital gains deduction) in taxable year 1983. Petitioners argue that the proceeds from the Gosen payments *83 were never receipts of the corporation but instead were only receipts of petitioner; therefore, petitioner never diverted corporate receipts. The crux of petitioners' argument is that petitioner was not acting in his official capacity as president of the corporation when he executed the Gosen agreements or when he received the Gosen payments. Petitioners argue that both Gosen and petitioner believed the Gosen agreements were personal agreements between Gosen and petitioner and not between Gosen and EAI. The facts indicate otherwise, however. A corporation cannot act for itself; it can act only through its officers and agents. American Lithofold Corp. v. Commissioner, 55 T.C. 904, 925 (1971). In the instant case, each of the Gosen agreements refers to the parties as Gosen and EAI. The Gosen agreements pertained solely to purchases by EAI as Gosen's exclusive U.S. sales agent. Thus, the agreements were not ventures entered into separately from EAI's corporate business. Additionally, the Gosen payments were based solely on EAI's purchases and were not made to compensate petitioner for any additional services rendered by him. Further, petitioner signed two *84 of these agreements specifically as president of EAI. All of these facts indicate petitioner was in fact acting in his official capacity for the corporation when he executed the Gosen agreements and when he received the Gosen payments. Petitioners argue on brief that Gosen and petitioner believed the Gosen agreements were personal agreements between themselves. However, both Mr. Matsuo, who was head of the export-import department of Gosen and who was involved in the execution of all the Gosen agreements, and petitioner testified that all the Gosen agreements were between Gosen and EAI. They both further testified that the commission payments were based on the amount of sales by Gosen to EAI. EAI even acknowledged the Gosen payments as its income on the statement attached to its 1983 corporate income tax return. Finally, Shokai, as successor of EAI, reported the income on its 1984 corporate income tax return. Thus, in actuality, the parties believed the Gosen agreements were agreements between Gosen and EAI and not between Gosen and petitioner. We have reviewed the cases cited by petitioners in their brief and in support of their arguments on this issue and find them to be *85 nondispositive. We have also considered petitioners' other arguments in their brief and find them unpersuasive or without merit. In sum, based on the fact that petitioner was acting in his official capacity for the corporation when he executed the Gosen agreements and when he received the Gosen payments, and based on the understanding of both the pertinent parties that the Gosen agreements were between the corporations, we conclude that the Gosen payments were gross receipts of EAI. Even though the proceeds from the Gosen payments were gross receipts of EAI, none of them were recorded on the corporate books as income or deposited into the corporation's bank account. Instead, petitioner treated these receipts as his income during the years in issue. Two of the Gosen payments were made by direct remittances to petitioner, and the remaining were electronically deposited into his Osaka account. While the NTA requested the payments be made by bank transfer, petitioner specifically requested they be deposited into his Osaka account. There is no indication any other funds were deposited into the Osaka account in any of the years in issue. Petitioner withdrew funds from his Osaka *86 account for various reasons. Petitioner withdrew a large amount to transfer to his personal accounts maintained in the United States. To effect these transfers, petitioner withdrew money in small increments and then mailed them to the United States. Petitioner utilized this method of transferring funds to avoid violating customs laws. Petitioner also withdrew funds from the Osaka account to pay for his expenses incurred while traveling in Japan and to transfer to his Singapore account. In the taxable years 1980 through 1983, petitioner withdrew $ 565,551 from this account in the following yearly amounts: $ 66,370 in 1980, $ 215,287 in 1981, $ 140,571 in 1982, and $ 143,323 in 1983. Petitioner could and did use the proceeds from the Gosen payments as he desired and, thus, treated these proceeds as his own income during the years in issue. In sum, petitioner diverted the Gosen payments, the corporate receipts of EAI, to himself during the taxable years 1980 through 1983. Accordingly, such receipts are fully taxable to EAI, the corporation to which they are attributable, and properly treated as constructive dividends to the Alexanders for tax purposes as determined by respondent. *87 B. When the Gosen Payments are Includable in Taxable Income
Respondent alleges the income from the Gosen payments was reportable in the taxable income of EAI and the Alexanders in the years that petitioner received them in his Osaka account. Petitioners, all cash basis taxpayers, argue that this income was not reportable upon receipt because the income had a "restriction" on its disposition. This restriction involved the oral agreement that the proceeds be returned if the NTA determined Gosen improperly deducted the Gosen payments. Petitioners allege they properly reported the income in their 1984 taxable year when the NTA completed its audit and allowed Gosen's deductions for the Gosen payments. Generally, for cash basis taxpayers, all items which constitute income are to be reported as income in the taxable year received. Sec. 1.451-1(a), Income Tax Regs. However, if a cash basis taxpayer receives income that he may have to return, the income may or may not be reportable in taxable income upon receipt. If such income is not subject to any restrictions on its disposition and the taxpayer receives the income pursuant to a "claim of right", the income is includable upon *88 receipt. North American Oil Consolidated v. Burnet, 286 U.S. 417, 424 (1932). For earnings to be included in taxable income upon receipt pursuant to the "claim of right" doctrine, the taxpayer (1) must have received money or other property; (2) must have control over the utilization and disposition of the received money or property; and (3) must assert a "claim of right" or entitlement to receive the money or property. Id. at 424. A taxpayer has a claim of right or entitlement to receive money or property when funds are received and treated by him as belonging to him. Healy v. Commissioner, 345 U.S. 278, 282 (1953). The Gosen payments were unequivocally deposited into petitioners' Osaka account. Thus, petitioner received the Gosen payments. Petitioner also had control over the utilization and disposition of these payments. The payments were either deposited directly into the Osaka account, petitioner's personal bank account, or were paid by remittances to him. There is no indication any other funds were deposited into this account. Of the funds deposited into this account, petitioner freely withdrew them to pay *89 for traveling expenses when he traveled to Japan, to transfer back to the United States to deposit into his personal accounts, or to transfer into his Singapore account. While petitioner had a contingent obligation to return the Gosen payments should the NTA disallow Gosen's deduction for the payments, the funds were not required to be held in the Osaka account until the NTA or any other entity or person authorized their release. In sum, petitioner could freely utilize and dispose of all the Gosen payments deposited into his Osaka account during the years in issue. Finally, petitioner had a "claim of right" or entitlement to receive the Gosen payments because, as shown supra, he received and treated the Gosen payments as belonging to him. Petitioners argue that Mutual Telephone Co. v. United States, 204 F.2d 160 (9th Cir. 1953), is dispositive of this issue and would require the Gosen payments not be included in taxable income upon receipt. The facts in Mutual Telephone are different from the facts in the instant case, however. In Mutual Telephone, the taxpayers could not withdraw any of its income deposited in an account until a particular governmental *90 agency approved of the withdrawal. Id. at 160-161. The Ninth Circuit held that in this situation, the taxpayers did not have control over the utilization and disposition of the moneys deposited in the account. Id. at 161-162. In the instant case in contrast, petitioner withdrew the Gosen payments from his Osaka account without the approval of any person or any entity. Therefore, petitioners' reliance on Mutual Telephone is misplaced. Petitioners also argue that Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990), is dispositive of this issue and would require that the income not be taxable upon receipt. Indianapolis Power, however, has no bearing on the instant issue. The issue present in Indianapolis Power was whether moneys received by a taxpayer were advance payments of income or were deposits. The Court stated that the proper test for making this determination was whether the taxpayer enjoyed "complete dominion" over the moneys. Id. at 593. The Court further stated that a taxpayer does not have "complete dominion" over a given sum until the taxpayer has some guarantee that he *91 will be allowed to keep the given sum. Id. at 593. In the instant case, petitioners assert that because they had no guarantee they would be allowed to keep the Gosen payments until the NTA completed its audit in 1984, they did not have "complete dominion" over the payments until this time. Thus, petitioners conclude, the income was not reportable in taxable income until taxable year 1984. Petitioners' reliance on this language is inappropriate, however. The "complete dominion" language in Indianapolis Power is used only to distinguish advance payments from deposits. Whether the Gosen payments were advance payments or deposits is not the issue in the instant case. We hold that the Gosen payments are to be included in the taxable income of EAI and the Alexanders in the years received by petitioner as determined by respondent. IV. PETITIONER'S FRAUD Respondent determined that the income tax deficiencies for which petitioner is liable for the taxable years 1980 through 1983 resulting from his failure to report the Gosen payments as income were due to a fraudulent intent to evade paying taxes known to be owing. If respondent's determination is correct, (1) the statute *92 of limitations does not bar the assessment and collection of the deficiencies and additions to tax set forth in respondent's notice of deficiency to petitioner for the taxable years 1980 through 1983, and (2) petitioner is liable for the additions to tax for fraud pursuant to section 6653(b) for the taxable years 1980 through 1983. These issues will be discussed in subsequent sections of this opinion following our discussion regarding petitioner's fraudulent intent. A. Petitioner's Fraudulent Intent
In any case involving the issue of fraud with the intent to evade paying taxes known to be owing, the burden of proof is on respondent to prove by clear and convincing evidence that the taxpayer intended to evade paying taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. at 874; Truesdell v. Commissioner, 89 T.C. at 1301. The existence of fraud is a question of fact to be resolved from the entire record. DiLeo v. Commissioner, supra at 874; Truesdell v. Commissioner, supra at 1301. *93 The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud is not to be presumed. Truesdell v. Commissioner, supra at 1301. Because fraud can rarely be established by direct proof of a taxpayer's intent, however, respondent may establish the required quantum of proof by circumstantial evidence. DiLeo v. Commissioner, supra at 874; Truesdell v. Commissioner, supra at 1301. The Court of Appeals for the Ninth Circuit reaffirmed that it is appropriate to infer fraudulent intent from various kinds of circumstantial evidence and has set forth a nonexclusive list of the "badges of fraud" that demonstrate fraudulent intent. These badges of fraud include: (1) Understatements of income, (2) the maintenance of inadequate records, (3) the concealment of assets, (4) implausible or inconsistent explanations of behavior, (5) a failure to file tax returns, and (6) a failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. *94 Understatements of Income. Not only is an understatement of income circumstantial evidence of fraud, Bradford v. Commissioner, supra at 307, but as indicated by this Court, a consistent and substantial understatement of income is by itself strong evidence of fraud. Truesdell v. Commissioner, supra at 1302. In the instant case, respondent determined the Alexanders recognized income from the Gosen payments for 1980 through 1983 in the amounts of $ 184,637, $ 222,346, $ 247,286, and $ 258,135 ($ 242,776 as dividend income and $ 15,359 as a gain from the sale or exchange of property), respectively. The Alexanders did not, however, report any of this income in the taxable years in issue. The Alexanders did report gross income for these years in the amounts of $ 344,601, $ 219,546, $ 251,603, and $ 284,810, respectively. Thus, the Alexanders understated their income in 1980 by 34 percent, in 1981 by 50 percent, in 1982 by 49 percent, and in 1983 by 47 percent. We conclude that the Alexanders substantially understated their income in these years. Accordingly, these substantial understatements are strong evidence of petitioner's *95 fraudulent intent in the taxable years 1980 through 1983. This fact together with the following facts evidencing petitioner's intent to conceal the existence and receipt of the Gosen payments actually justifies the inference of fraud. See Brooks v. Commissioner, 82 T.C. 413, 431 (1984). The Maintenance of Inadequate Records. Petitioner kept no records of the amounts earned or received from Gosen for the Gosen payments. He did not even receive the bank statements for the Osaka account during the years in issue. While Gosen prepared statements for EAI outlining the amount of the Gosen payments, it did not send these statements to EAI or petitioner. Instead, Gosen held the statements for petitioner to review and to sign when he visited Japan. There is no indication petitioner kept any copies of these statements. In sum, petitioner not only maintained inadequate records on the Gosen payments but maintained no records. His failure to maintain any records signifies his intent to conceal the existence and receipt of the Gosen payments. The Concealment of Assets. Further evidence of petitioner's intent to conceal the existence of the Gosen payments *96 is that only a few people knew of the existence of the payments or the Osaka account. There is no evidence that any person or entity, other than petitioner, Gosen, and Mr. K. Bartelt, knew of the existence of either prior to 1984. Prior to 1984, Mr. E. Bartelt, the accountant who prepared EAI's and the Alexanders' tax returns, did not know of either. EAI's office manager also did not know of the Gosen payments or the Osaka account. EAI's office manager made deposits into the corporation's bank account, invoiced customers, paid corporate expenses, signed corporate checks, forwarded income and expense information to Mr. E. Bartelt, the corporate accountant, for entry into the corporate books, answered the telephone, and opened mail. This person was actively involved in the corporation's financial affairs. In the normal course of performing his duties, he should have discovered the existence of the Gosen payments and the Osaka account. His failure to do so further indicates petitioner's efforts to conceal the existence of the Gosen payments and the Osaka account. Other miscellaneous evidence signifies petitioner's intent to conceal the existence of the Gosen payments and the Osaka *97 account. Petitioner specifically requested the Gosen payments be sent to his Osaka account in Japan to the exclusion of any bank account he or EAI maintained in the United States. Petitioner also requested all bank statements be held in Japan and not be mailed to him in the United States. These facts further illustrate petitioner's efforts to conceal the existence of the Gosen payments and the Osaka account. Implausible or Inconsistent Explanations of Behavior. Petitioner's implausible and inconsistent explanations for some of his behavior also signify his fraudulent intent. Petitioner explained at trial that he did not report the Gosen payments as income because Mr. K. Bartelt advised him the income was not taxable until brought into the United States. However, this proffered explanation is implausible since petitioner did not report the income even when he did bring it into the United States. Further, petitioner argued on brief that he did not report the Gosen payments because he felt the alleged restriction involving the potential return of the payments precluded him from having to do so. This reason is inconsistent with the reason stated at trial for why he failed *98 to report the income. It is also an implausible explanation of why he did not report the income since there is no indication he was advised prior to or during the years in issue that the payments were not taxable until the "restriction" was removed. We also find petitioner's testimony that he was ignorant "as far as tax business" to be unbelievable. While petitioner had only a high school level education, never received any formal training in accounting, bookkeeping, or the preparation of tax returns, and claims never to have prepared or reviewed any tax returns, many objective facts exist indicating petitioner's familiarity with tax concepts and participation in tax planning. Petitioner had discussed with his accountant setting up a domestic international sales corporation to alleviate the tax burden of foreign earned income. They also discussed the tax advantages of purchasing municipal bonds. As mentioned several times supra, he also inquired of and discussed with Mr. K. Bartelt the proper tax treatment of the Gosen payments. Petitioner also discussed with his corporate attorney such tax topics as controlled foreign corporations, the attribution rules of subchapter F, *99 and the availability of lower tax rates in lesser-developed countries. We also find implausible petitioner's claim that he never reviewed tax returns or took any part in classifying deductions for income tax purposes. At trial, petitioner testified he took no deductions for traveling expenses incurred while traveling in Japan. If he never reviewed a tax return and never participated in classifying deductions, it is not easy to believe that he knew what deductions were actually taken. By denying that he claimed any deductions for travel, petitioner contradicts his claim never to have reviewed a tax return or participated in classifying deductions. We conclude that in the taxable years 1980 through 1983, petitioner substantially understated his taxable income, maintained inadequate records of the Gosen payments, concealed the existence of both the Gosen payments and the Osaka account, and provided implausible and inconsistent explanations for some of his behavior. Accordingly, we are convinced petitioner intended to evade paying taxes known to be owing for the taxable years 1980 through 1983 by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes *100 due from the Gosen payments. Moreover and in accordance with the Fifth Circuit's decision in United States v. Thetford, 676 F.2d 170 (5th Cir. 1982), we are further convinced petitioner committed fraud in 1980 through 1983. In Thetford, the Fifth Circuit held that a taxpayer's diversion of corporate funds to his own use, coupled with his failure to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, is sufficient to imply a willful intent to evade paying taxes. Id. at 175. Similarly, in the instant case, petitioner also had control of diverted corporate funds yet failed to report them as taxable income or to make any adjustment in the corporate books to reflect a return of capital. We hold respondent has presented sufficient circumstantial evidence proving by clear and convincing evidence that petitioner intended to evade paying taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes due in the taxable years 1980, 1981, 1982, and 1983. B. Petitioner's Reliance on an Accountant
A taxpayer may rebut the Government's proof *101 of fraud by establishing a good faith reliance on a qualified accountant after full disclosure of tax-related information. United States v. Claiborne, 765 F.2d 784, 798 (9th Cir. 1985); Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976). Petitioner argues he reasonably relied on the advice of either Mr. K. Bartelt or Mr. E. Bartelt, both accountants, regarding the tax treatment of the Gosen payments and therefore can rebut respondent's proof of fraud. We conclude, however, petitioner did not rely on any advice offered by either of the Bartelts. Mr. K. Bartelt was an accountant and petitioner's friend. Mr. K. Bartelt retired as an accountant in 1968 and left his business to his son, Mr. E. Bartelt. Prior to his retirement, Mr. K. Bartelt advised petitioner on tax matters; after his retirement, he continued to advise petitioner on an informal basis. Mr. K. Bartelt specifically advised petitioner the Gosen payments were not subject to U.S. tax until they were actually brought into this country. However, petitioner brought a portion of these moneys into the United States during the years in issue yet did not report them in taxable *102 income. Petitioner, then, did not actually rely on Mr. K. Bartelt's advice. Since Mr. K. Bartelt was not aware of petitioner's contingent oral agreement to return the Gosen payments, he could not have rendered any advice on this issue on which petitioner could have relied. We conclude petitioner did not actually rely on any advice Mr. K. Bartelt offered. We conclude also that petitioner did not actually rely on the advice of Mr. E. Bartelt as a reason for not reporting the Gosen payments in taxable income. Mr. E. Bartelt prepared the Alexanders' and EAI's tax returns for the years at issue. He also prepared the Alexanders' personal financial statements. During the years in issue, Mr. E. Bartelt was never aware of the Osaka account, the Gosen agreements, the Gosen payments, or petitioner's contingent oral agreement to return the Gosen payments. Therefore, Mr. E. Bartelt could not have advised petitioner on the tax treatment of the Gosen payments. In fact, petitioner stated at trial he never specifically requested Mr. E. Bartelt's advice on the tax treatment of the Gosen payments. We have considered petitioners' other arguments on this issue and find them either unpersuasive *103 or without merit. V. THE CORPORATION'S FRAUD Respondent also determined the income tax deficiencies for which the corporation is liable resulting from its failure to report the Gosen payments as income for the taxable years 1980 through 1983 were due to a fraudulent intent to evade paying taxes known to be owing. If respondent's determination is correct, (1) the statute of limitations does not bar the assessment and collection of the deficiencies and additions to tax set forth in respondent's notice of deficiency to the corporation for the taxable years 1980 through 1983, and (2) the corporation is liable for the additions to tax for fraud pursuant to section 6653 for the taxable years 1980 through 1983. These issues will be discussed in subsequent sections of this opinion following our discussion regarding the corporation's fraudulent intent. A. The Corporation's Fraud -- Taxable Years 1980, 1981, and 1982
A corporation can act only through its officers and agents, and their intentions must be imputed to the corporation. Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). When a dominant stockholder/officer's interests are *104 not antagonistic to the corporation, the fraudulent intent of the stockholder/officer has been imputed to the corporation. Auerbach Shoe Co. v. Commissioner, 216 F.2d 693 (1st Cir. 1954), affg. 21 T.C. 191 (1953); American Lithofold Corp. v. Commissioner, 55 T.C. at 925-926; Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833 (1954); see Botwinik Brothers of Mass., Inc. v. Commissioner, supra at 996. In the case of sole or dominant shareholders who divert corporate funds for their own benefit, such shareholders' actions are not regarded as antagonistic to the corporation since to a large extent these shareholders are merely taking their own money and thus obtaining from the corporation what would otherwise be available to them as dividends. American Lithofold Corp. v. Commissioner, supra at 926; Botwinik Brothers of Mass., Inc. v. Commissioner, supra at 996. In the instant case, EAI cannot act on its own; its fraud necessarily depends upon the fraudulent acts of its officers and agents. During the years in issue, the record indicates *105 EAI had one stockholder of record -- petitioner, and three officers -- Mr. E. Bartelt, Mrs. Alexander, and petitioner. As officers, Mr. E. Bartelt and Mrs. Alexander performed no official corporate duties and thus cannot be said to have acted for the corporation in any manner. Petitioner, EAI's president, was then the only officer that performed any official corporate duties for EAI. As president, petitioner clearly dominated EAI's affairs and controlled all of its business operations. In sum, petitioner was not only EAI's sole stockholder of record but was also its dominant stockholder/officer during the years in issue. As such, in fraudulently diverting corporate funds to his own use, petitioner's actions are not regarded as antagonistic to EAI. Accordingly, petitioner's fraudulent intent is imputed to EAI for the taxable years 1980 through 1982. Therefore, we sustain respondent's determination that EAI fraudulently intended to evade paying taxes known to be owing in taxable years 1980, 1981, and 1982. B. The Corporation's Reliance on an Accountant's Advice
The corporation argues it reasonably relied on the advice of either Mr. K. Bartelt or Mr. E. Bartelt in the taxable *106 years 1980, 1981, and 1982 regarding the tax treatment of the Gosen payments and therefore can rebut respondent's proof of fraud for these years. United States v. Claiborne, supra at 798; Estate of Temple v. Commissioner, supra at 162. Again, a corporation can act only through its officers and agents. Botwinik Brothers of Mass., Inc. v. Commissioner, supra at 996. Because we have already held petitioner did not rely on the advice of either Mr. K. Bartelt or Mr. E. Bartelt regarding the tax treatment of the Gosen payments, his lack of reliance is imputed to EAI for taxable years 1980, 1981, and 1982. C. The Corporation's Fraud -- Taxable Year 1983
Respondent also determined the corporation fraudulently intended to evade paying taxes known to be owing in taxable year 1983. The corporation alleges it did not fraudulently intend to evade paying taxes known to be owing in taxable year 1983 because it, inter alia, reasonably relied on the advice of its tax advisers in not reporting the income in this year. Sometime after February 28, 1984, petitioner learned the NTA had completed its audit of Gosen. In *107 May of the same year, the NTA notified the IRS of the potential existence of petitioner's Osaka account, the Gosen agreements, and the Gosen payments. In July, the IRS contacted petitioner for the first time regarding the tax liabilities in issue. At this point, petitioner for the first time disclosed the existence of the Gosen agreements, the Gosen payments, the Osaka account, and the oral agreement regarding repayment to parties besides himself, Mr. K. Bartelt, and Gosen. Petitioner told Mr. E. Bartelt, another accountant, and his corporate attorney. These three "tax advisers" determined the Gosen payments had not accrued as income until 1984 when the NTA had finished its audit of Gosen. Accordingly, they advised the corporation not to report the income until taxable year 1984. They further advised the corporation to attach a statement to its 1983 tax return stating the following: Taxpayer has been advised that the Japanese Tax Authorities have recently completed an examination of taxpayer's Japanese supplier. Taxpayer understands that the Japanese Tax Authorities have authorized the propriety of payments to the taxpayer of amounts originally held in an account maintained *108 in Japan. Report of the examination was not provided taxpayer until after its fiscal year ended February 1984 and the supplier notified it of the release of any claim for the earlier fiscal year involved. Accordingly, these amounts will be included in taxpayer's income for the later year subject to conclusion of the pending Internal Revenue Service investigation into prior fiscal year of taxpayer. While it is expected that these amounts will total $ 870,000.00, a cursory review of the records require a deposit search to determine whether any payment was previously recognized by the taxpayer.
The corporation followed the advice of its tax advisers, for it attached the above statement to its 1983 tax return and it did not report the income until taxable year 1984. While we consider this advice to have been erroneous, the corporation, in following it in connection with the return filed for the taxable year 1983, did not omit income fraudulently with the intent to evade tax. See United Dressed Beef Co. v. Commissioner, 23 T.C. 879, 887 (1955). In conclusion, we do not sustain respondent's determination that EAI fraudulently intended to evade paying taxes *109 known to be owing in taxable year 1983. VI. STATUTES OF LIMITATIONS A. The Corporation
The corporation asserts that the statute of limitations bars the assessment and collection of the deficiencies and additions to tax for which it is determined liable for the taxable years 1980 through 1983 because respondent's notice of deficiency was issued after the expiration of the general 3-year limitations period. Respondent counters that the limitations period is extended indefinitely for these years pursuant to section 6501(c)(1) because the corporation filed fraudulent returns for all these years with the intent to evade paying tax. Additions to tax are assessed and collected in the same manner as taxes. Sec. 6659(a)(1) for 1980 and 1981; sec. 6662(a)(1) for 1982 and 1983. Regarding taxable years 1980, 1981, and 1982, respondent has established by clear and convincing evidence that EAI fraudulently intended to evade paying taxes known to be owing in these years. Accordingly, the limitations period for issuing the notice of deficiency for taxable years 1980, 1981, and 1982 is extended indefinitely. However, regarding taxable year 1983, respondent has not established by clear *110 and convincing evidence that EAI fraudulently intended to evade paying taxes known to be owing in this taxable year. Therefore, the statute of limitations is not extended for this taxable year pursuant to section 6501(c)(1) for filing a fraudulent return. Therefore, the statute of limitations does bar the assessment and collection of the deficiencies and additions to tax of EAI for the taxable year 1983. B. Petitioner
Petitioner asserts that the statute of limitations bars the assessment and collection of the deficiencies and additions to tax for which he is determined liable for the taxable years 1980 through 1983 because respondent's notice of deficiency was issued after the expiration of the general 3-year limitations period. Respondent counters that this limitations period is extended indefinitely for 1980 and 1981 pursuant to section 6501(c)(1) because petitioner filed fraudulent returns for these years with the intent to evade paying tax. Respondent contends further that the limitations period is extended an additional 6 years for 1982 and 1983 pursuant to section 6501(e)(1)(A) because petitioner failed to report an excess of 25 percent of his gross income in these *111 years. Again, additions to tax are assessed and collected in the same manner as taxes. Sec. 6659(a)(1) for 1980 and 1981; sec. 6662(a)(1) for 1982 and 1983. Respondent has established by clear and convincing evidence that petitioner fraudulently intended to evade paying taxes known to be owing for the taxable years 1980, 1981, 1982, and 1983. Therefore, the limitations period for issuing the notice of deficiency determining the deficiencies and additions to tax for these years is extended indefinitely pursuant to section 6501(c)(1). Accordingly, we need not consider whether section 6501(e)(1) applies to extend the general limitations period for 1982 and 1983 because section 6501(c)(1) applies to these years. C. Mrs. Alexander
Mrs. Alexander also asserts that the statute of limitations bars the assessment and collection of the deficiencies and additions to tax for which she is determined liable for the taxable years 1982 and 1983 because respondent's notice of deficiency was issued after the expiration of the general 3-year limitations period. However, section 6501(c)(1) extends indefinitely the limitations period for a false or fraudulent joint return where fraud is proven *112 against one spouse. Benjamin v. Commissioner, 66 T.C. 1084, 1100 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). Accordingly, because respondent has proven petitioner fraudulently failed to report income in taxable years 1982 and 1983 and because the Alexanders filed joint returns for these years, the statute of limitations does not bar the assessment and collection of the deficiencies and additions to tax for which Mrs. Alexander is determined liable for taxable years 1982 and 1983. VII. THE CORPORATION'S ADDITIONS TO TAX A. Section 6653(b)/6653(b)(1) -- Taxable Years 1980 through 1983 Section 6653(b)(2) -- Taxable Years 1982 and 1983
Respondent determined that a portion of the corporation's underpayments for the taxable years 1980 through 1983 was due to fraud. Accordingly, respondent determined the corporation was liable for the 50-percent addition to tax for fraud pursuant to section 6653(b) for the taxable years 1980 and 1981, and pursuant to section 6653(b)(1) for the taxable years 1982 and 1983 on the portion of the understatements attributable to fraud. Respondent also determined the corporation was liable for the addition to tax *113 for taxable years 1982 and 1983, pursuant to section 6653(b)(2), equal to 50 percent of the interest computed on the portion of the underpayment attributable to fraud. Alternative to the addition to tax for fraud for the taxable years 1982 and 1983, respondent determined the corporation was liable for a 5-percent addition to tax for negligence or intentional disregard of rules and regulations pursuant to section 6653(a)(1), and an addition equal to 50 percent of the interest computed on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to section 6653(a)(2). For a taxpayer to be liable for the additions to tax for fraud, respondent must prove by clear and convincing evidence that (1) the taxpayer has underpaid his taxes for the year in issue, and (2) some part of the underpayment is due to fraud. Sec. 6653(b) for 1980 and 1981; sec. 6653(b)(1) and 6653(b)(2) for 1982 and 1983; sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. at 873. Regarding taxable years 1980, 1981, and 1982, respondent has proven that the corporation underpaid its taxes for the taxable years 1980 through 1982. *114 Respondent has also proven by clear and convincing evidence that the underpayment resulting from the corporation's failure to report the Gosen payments as income was due to fraud. Therefore, we sustain respondent's determination that the corporation is liable for the additions to tax for fraud pursuant to section 6653(b)/6653(b)(1) for the taxable years 1980, 1981, and 1982, and pursuant to section 6653(b)(2) for the taxable year 1982 on the underpayments resulting from the corporation's failure to report the Gosen payments as income. Finally, because we sustain respondent's determination that the corporation is liable for the addition to tax for fraud for the taxable year ended 1982, the corporation cannot also be liable for the addition to tax for negligence in that year. Sec. 6653(b)(3). Regarding taxable year 1983, because respondent failed to prove by clear and convincing evidence the corporation fraudulently intended to evade paying taxes known to be owing in this year, we do not sustain respondent's determination that the corporation is liable for the additions to tax for fraud pursuant to section 6653(b)(1) and (2) for 1983. Additionally, because the statute of limitations *115 bars the assessment and collection of the alternative negligence additions pursuant to section 6653(a)(1) and (2) for the taxable year 1983, the corporation is not liable for these additions in that taxable year. B. Section 6661 -- Taxable Years 1982 and 1983
Respondent determined that the corporation had a substantial understatement of income tax within the meaning of section 6661 for the taxable years 1982 and 1983. Accordingly, respondent determined the corporation was liable for an addition to tax for these years pursuant to section 6661. As discussed supra at section VI(A), the statute of limitations bars the assessment and collection of this addition for the taxable year 1983. The corporation contests the section 6661 addition for taxable year 1982 on several grounds. We have considered each of these grounds and find all but two to be either unpersuasive and without merit or not adequately proven by the corporation. We will not discuss any of these grounds but two. The corporation contests the section 6661 addition to tax on the ground that the statute of limitations bars the assessment and collection of this addition for the taxable year 1982. As discussed *116 supra at section VI(A), the statute of limitations does not bar the assessment or collection of the addition to tax determined against the corporation for the taxable year 1982. The corporation also contests the section 6661 addition in 1982 on the ground that there was no substantial understatement for this taxable year. Regarding this contention, we have concluded that EAI understated its income in the taxable year 1982 in the amount determined by respondent. Therefore, we sustain respondent's determination on this issue for the taxable year 1982. C. Section 6651(a)(1) -- Taxable Years 1982 and 1983
Respondent determined that the corporation failed to file its tax returns for the taxable years 1982 and 1983 within the time prescribed by law and that such failure was not due to reasonable cause. Accordingly, respondent determined the corporation was liable for a 25-percent addition to tax for these years pursuant to section 6651(a)(1). In addition to the statute of limitations barring the assessment and collection of this addition to tax for the taxable year 1983, respondent stipulated that EAI timely filed its tax returns for both 1982 and 1983. See also sec. 6653(d). *117 Accordingly, we do not sustain respondent's determination that the corporation is liable for this addition to tax for the taxable years 1982 or 1983. D. Summary
For the taxable years 1980 and 1981, the corporation is liable for the addition to tax for fraud pursuant to section 6653(b). For the taxable year 1982, the corporation is liable for the addition to tax for fraud pursuant to section 6653(b)(1), the addition equal to 50 percent of the interest computed on the portion of the underpayment attributable to fraud pursuant to section 6653(b)(2), and the section 6661 addition for a substantial understatement of income tax (if a substantial understatement exists). For the taxable year 1983, the corporation is not liable for any additions to tax. VIII. ADDITIONS TO TAX -- PETITIONER A. Section 6653(b)/6653(b)(1) -- Taxable Years 1980, 1981, 1982, and 1983
Section 6653(b)(2) -- Taxable Years 1982 and 1983
Respondent determined that the underpayments of tax required to be shown on petitioner's returns for 1980, 1981, 1982, and 1983 were due to fraud. Accordingly, respondent determined petitioner was liable for the 50-percent addition to tax for fraud pursuant *118 to section 6653(b) for the taxable years 1980 and 1981, and pursuant to section 6653(b)(1) for the taxable years 1982 and 1983. Respondent also determined petitioner was liable for the addition to tax for 1982 and 1983, pursuant to section 6653(b)(2), equal to 50 percent of the interest computed on the portion of the underpayment attributable to fraud. In the alternative to the addition to tax for fraud for 1982 and 1983, respondent determined petitioner was liable for the 5 percent addition to tax for negligence or intentional disregard of rules and regulations pursuant to section 6653(a)(1), and the addition equal to 50 percent of the interest computed on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to section 6653(a)(2). Again, for a taxpayer to be liable for the additions to tax for fraud, respondent must prove by clear and convincing evidence that (1) the taxpayer has underpaid his taxes for the year in issue, and (2) some part of the underpayment is due to fraud. Sec. 6653(b) for 1980 and 1981; sec. 6653(b)(1) and 6653(b)(2) for 1982 and 1983; sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. at 873. *119 Respondent has established that petitioner underpaid his taxes for 1980 through 1983. Respondent has also established by clear and convincing evidence that the underpayment resulting from petitioner's failure to report the Gosen payments as income was due to fraud. Therefore, we sustain respondent's determination that petitioner is liable for the additions to tax for fraud pursuant to section 6653(b)/6653(b)(1) for the taxable years ended 1980, 1981, 1982, and 1983, and pursuant to section 6653(b)(2) for 1982 and 1983. We note that Mrs. Alexander is not jointly and severally liable for petitioner's additions to tax for fraud pursuant to sections 6653(b)(1) or 6653(b)(2) for the taxable years 1982 and 1983. Sec. 6653(b)(4). Because we sustain respondent's determination that petitioner is liable for the addition to tax for fraud for the taxable years 1982 and 1983, petitioner cannot also be liable for the addition to tax for negligence in 1982 and 1983. Sec. 6653(b)(3). B. Section 6661 -- Taxable Years 1982 and 1983
Respondent determined petitioner had a substantial understatement of income tax within the meaning of section 6661 for the taxable years 1982 and 1983. Accordingly, *120 respondent determined petitioner was liable for an addition to tax for these years pursuant to section 6661. Petitioner contests the section 6661 addition to tax on several grounds. We have considered each of these grounds and find all but two to be either unpersuasive and without merit or not adequately proven by petitioner. We will not discuss any of these grounds but two. Petitioner contests the section 6661 addition to tax on the ground that the statute of limitations bars its collection and assessment. As discussed supra at section VI(B), the statute of limitations does not bar the assessment and collection of any additions to tax for which petitioner is determined liable. Petitioner also contests the section 6661 addition to tax on the ground that there was no substantial understatement for 1982 and 1983. Regarding this contention, we have concluded that the Alexanders understated their income in these taxable years in the amounts determined by respondent; therefore, we sustain respondent's determination on this issue. See Benjamin v. Commissioner, 66 T.C. 1084, 1100-1101 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). IX. ADDITIONS *121 TO TAX -- MRS. ALEXANDER A. Section 6653(a)(1) -- Taxable Years 1982 and 1983
Section 6653(a)(2) -- Taxable Years 1982 and 1983
Respondent determined that the underpayments of tax required to be shown on Mrs. Alexander's returns for 1982 and 1983 were due to negligence or intentional disregard of rules and regulations. Accordingly, respondent determined that she was liable for the 5-percent addition to tax for negligence pursuant to section 6653(a)(1) for these years. Respondent also determined Mrs. Alexander was liable for the addition to tax equal to 50 percent of the interest computed on the portion of the understatement attributable to negligence or intentional disregard of rules and regulations for 1982 and 1983 pursuant to section 6653(a)(2). Petitioner and Mrs. Alexander filed joint income tax returns for the taxable years 1982 and 1983. The liability for additions to tax for taxpayers who file jointly is joint and several. Sec. 6013(d)(3); Pesch v. Commissioner, 78 T.C. 100, 129 (1982). We have found that petitioner is liable for the additions to tax for fraud pursuant to section 6653(b)(1) and (2) for the 1982 and 1983 taxable years. *122 If we were to hold Mrs. Alexander liable in 1982 and 1983 for the additions to tax for negligence, petitioner would then be jointly and severally liable for the negligence additions to tax in these taxable years. A taxpayer cannot be liable for the addition to tax for fraud and the addition to tax for negligence. Sec. 6653(b)(3). Accordingly, we do not sustain respondent's determination on this issue as to Mrs. Alexander. See Minter v. Commissioner, T.C. Memo. 1991-448; Congelliere v. Commissioner, T.C. Memo. 1990-265. B. Section 6661 -- Taxable Years 1982 and 1983
Respondent determined that Mrs. Alexander had a substantial understatement of income tax within the meaning of section 6661 for the taxable years ended 1982 and 1983. Accordingly, respondent determined her liable for the addition to tax for these years pursuant to section 6661. Mrs. Alexander contests this addition on several grounds. We have considered each of these grounds and find all but two to be either unpersuasive and without merit or not adequately proven by Mrs. Alexander. We will not discuss any of these grounds but two. Mrs. Alexander contests the section *123 6661 addition to tax on the ground that the statute of limitations bars its assessment and collection. As discussed supra at section VI(C), the statute of limitations does not bar the assessment and collection of any additions to tax for which Mrs. Alexander is determined liable. Mrs. Alexander contested the section 6661 addition on the ground that there was no substantial understatement for 1982 and 1983. Regarding this contention, we have concluded that the Alexanders understated their income in the taxable years 1982 and 1983 in the amounts determined by respondent; therefore, we sustain respondent's determination on this issue. See Benjamin v. Commissioner, supra at 1100-1101. X. SHOKAI'S LIABILITY AS SUCCESSOR OF EAI In 1984, Shokai and EAI merged into one corporation. Shokai became the surviving corporation and EAI the disappearing corporation. The tax liabilities in issue arose in the taxable years of EAI. Shokai asserts that it is liable for EAI's tax liabilities only as a "transferee" within the meaning of section 6901 and, therefore, its tax liabilities are limited to those specified in that section. Respondent asserts that he does *124 not have to resort to section 6901 to assess and collect EAI's deficiencies and additions to tax from Shokai because Shokai is primarily liable for EAI's tax liabilities. Where a relevant State statute provides that a new corporation in a consolidation succeeds to, and is liable for, the debts and liabilities of the consolidated corporations to the same extent as though incurred by the new corporation, the new corporation is primarily liable for the tax obligations of the consolidated corporations. Saenger v. Commissioner, 38 B.T.A. 1295, 1300-1302 (1938); Oswego Falls Corp. v. Commissioner, 26 B.T.A. 60, 69-71 (1932), affd. 71 F.2d 673 (2d Cir. 1934). This Court has indicated that this holding equally applies to corporations merged pursuant to State law. See Southern Pacific Transportation Co. v. Commissioner, 84 T.C. 387, 394 (1985). Therefore, where a relevant State statute provides that a surviving corporation in a merger succeeds to, and is liable for, the debts and liabilities of the disappearing corporation to the same extent as though incurred by the surviving corporation, the surviving corporation *125 is primarily liable for the tax obligations of the disappearing corporation. Section 6901 also provides a procedure whereby the Commissioner may be able to assess and collect the tax liabilities of a taxpayer from a transferee to whom the taxpayer has distributed his assets. A surviving corporation in a merger can be both primarily liable for a transferor's debts and liable as a transferee. Southern Pacific Transportation Co. v. Commissioner, supra at 395. Shokai and EAI merged pursuant to chapter 11 of the California Corporations Code. Section 1107 of chapter 11 provides that the surviving corporation in a merger pursuant to chapter 11 is subject to the debts and liabilities of the disappearing corporation in the same manner as if the surviving corporation had itself incurred them. Cal. Corp. Code sec. 1107 (West 1990). Therefore, Shokai is primarily liable pursuant to State law for the tax obligations of EAI. Accordingly, respondent need not resort to section 6901 to assess and collect EAI's deficiencies and additions to tax from Shokai. To reflect the foregoing, Decision will be entered for respondent in docket No. 16543-89. Decisions will *126 be entered under Rule 155 in docket Nos. 16443-89 and 18181-89. Footnotes
1. Cases of the following petitioners are consolidated herewith: Edward Alexander, docket No. 16543-89; and Estelle Alexander, docket No. 18181-89.↩
1. Alternative to the fraud additions, respondent determined additions to tax for negligence as follows: 2/28/83 -- $ 7,843 pursuant to sec. 6653(a)(1) and 50 percent of the interest on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to sec. 6653(a)(2); 2/28/84↩ -- $ 12,239 pursuant to sec. 6653(a)(1) and 50 percent of the interest on the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to sec. 6653(a)(2). 2. 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
1. Alternative to the fraud additions, respondent determined additions to tax for negligence as follows: 1982 -- $ 6,400 pursuant to sec. 6653(a)(1) and 50 percent of the interest on the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to sec. 6653(a)(2); 1983↩ -- $ 6,604 pursuant to sec. 6653(a)(1) and 50 percent of the interest on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations pursuant to sec. 6653(a)(2). 2. 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
1. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. Amounts paid by remittances to petitioner. The remaining payments were made by telegraphic transfer directly into the Osaka account.↩